Juno Malone BOREN, Executrix of the Estate of Dale Boren, Deceased, Plaintiff in Error,

v.

BEACON LIFE INSURANCE COMPANY, of Oklahoma City, Oklahoma, Defendant in Error.

No. 39542.

Supreme Court of Oklahoma.

June 12, 1962.

John A. Johnson and Robert E. Shelton of Savage, Gibson, Benefield & Shelton, Oklahoma City, for plaintiff in error.

Conner, Winters, Randolph & Ballaine, by Robert L. McGowen, Barry J. Galt, Tulsa, for defendant in error.

BLACKBIRD, Vice Chief Justice.

On May 5th, 1958, Dale Boren, a resident of Chickasha, Oklahoma, suffered a heart attack and died there. This appeal involves an action to recover on a so-called "credit life" insurance policy written on his life by W. Marvin Acree, Chickasha's First National Bank President, in the amount of $5,000.00, as agent of the defendant in error (hereinafter referred to as defendant) when Boren, President of Boren-Malone Company, a book and school supplies distributor, visited the Bank a few days earlier on April 29th.

When, on that date, Boren sought a loan of $5,000.00 from the Bank, Acree (who had never discussed life insurance with Boren before) called Boren's attention to his (or his company's) substantial indebtedness at the Bank, and told him:

"You ought to cover some of this with credit life which we will be glad to write for you up to the limits of whatever we can write in each company we represent.

\* \* \* \* \* \*

" '\* \* \* I have several contracts with several companies and I can write you up to $31,000.00, \* \* \*'."

When Boren assented to taking $10,000.00 of such insurance, and Acree assented to Boren's borrowing $5,000.00 from the Bank, Boren thereupon executed his promissory

note to the Bank for that amount; Boren deposited the $5,000.00 to the Boren-Malone Company's account in said bank; Acree wrote the subject policy in the same amount, on triplicate forms at his disposal, as well as another policy for a like amount on the University Life Insurance Company; and Boren paid the premium on each policy. Then Acree handed Boren the original of the subject policy, and in accord with an arrangement, or practice, that had apparently existed between him and defendant for some time, Acree deposited the premium money, Boren had paid him, in defendant's account at said Bank, attached a copy of the deposit slip to one of the two carbon copies of the policy, placed these two attached papers in an envelope addressed to defendant's office in Oklahoma City, and mailed it the same day.

Under the referred to arrangement between Acree and defendant, he had customarily deposited in defendant's said bank account, each month, all premiums he collected on its policies that month, and at the end of the month, defendant mailed him a check in an amount equal to 60% of the total of said premiums, as his commission for writing the policies that had become effective.

Under this arrangement, it was apparently not required that a separate application for each policy precede, or accompany, it to defendant's office, before the policy became effective; and, no such requirement was complied with as to the Boren transaction, although paragraph 2 of Acree's "Agency Agreement" with defendant, dated November 23, 1955, provided, among other things, that: "The Company reserves the right to accept or reject any application submitted."

A few weeks before he wrote the Boren policy, Acree apparently had a disagreement with the defendant company about insuring one "W. E. Walker." As a result, Cel E. Roso, Secretary of the Company, wrote Acree, under date of April 14, 1958, referring to a suggestion made by the Company's President, Mr. Gilham, to Acree, a week earlier, that he procure an agency from another company, and stating that, in view of said suggestion, " * * * we felt that you would voluntarily terminate your business with us." The letter went on to say that "As this was not the case * * *", the defendant company wished to exercise its right, under the Agency Agreement's above quoted provision, and reject certain named individuals' "policies". After listing the premiums, Acree had received from these individuals and deposited to defendant's account in the Chickasha Bank, the letter asked that he debit its said bank account with the total thereof, and added: "We also wish to advise you that we are terminating your contract and are exercising our right under the agency agreement to reject any further policies you may send us."

Thereafter, on April 26, 1958, Acree had a meeting with Gilham in Oklahoma City, where it was agreed, in brief substance, that defendant would continue, or "revive", its contract or agreement with Acree, and that he would sufficiently increase the proportion of regular life policies, to credit life policies, he had been writing for defendant "to give us a sufficient spread, * * *". As evidence of the fact that, as a result of this meeting, a severance of the agency relationship between defendant and Acree had been averted, Acree took back with him to Chickasha, a fresh lot of defendant's "supplies".

It will be remembered that it was on April 29, 1958, or the third day after this meeting, that the above described transaction with Boren occurred. For all that appears in evidence, the hereinbefore mentioned copy of the subject policy, with deposit slip attached, mailed to defendant from Chickasha, was not received, or at least, seen by anyone, in defendant's Oklahoma City office until the following Monday, May 5, 1958.

When this mailing came to Mr. Gilham's attention, he wrote Mr. Acree a letter, dated that day (May 5th), referring to the

subject policy, and one Acree had written on another named individual, as appearing "quite Hazardous." The letter further stated:

"So we can have some idea as to the type of risk we have on these two particular people, I am wondering if you would be so kind as to complete the inclosed forms on them."

By a letter Acree addressed to defendant on the same date (and which is thought to have passed the above-quoted letter in mail transit) he informed it of Boren's death that "morning".

A letter dated May 6, 1958, Acree addressed to Gilham, as defendant's President, in answer to Gilham's above-quoted letter read, in part as follows:

"In reply to your letter of May 5, I am returning questionaires on M. L. Peterson and Dale Boren, filled out to the best of my ability and as of the date of the policies.

"In regard to Mr. Boren, Of course, you know by now that he died of an heart attack yesterday morning. This is one that certainly could not be predicted by anyone. * * *."

The "form" referred to in Gilham's letter, which was filled out (posthumously) and returned to Gilham, in Acree's last-quoted letter, was as follows:

"BLForm #68        APPLICATION TO
BEACON LIFE INSURANCE COMPANY

"1. Full name of proposed Insured      Dale Boren     
     (a) If married woman, Maiden Name

"2. Address          Chickasha, Oklahoma     
              Street        City

"3. Date of Birth: Month December Day 1 Year 1900 Age 57
Race white Sex male.

"4. Place of birth Ellis County, Texas
            City    State or County

"5. Exact height and weight: approx. 6 ft. in. 210 lbs.

"6. Occupation President, Boren-Malone Company, Chickasha, Oklahoma

"7. Is applicant in good health at present?        Yes.
     (a) If not, explain:

"8. Has proposed insured ever:
     (a) Consulted or been treated by any physician or practitioner in the past five years? Give name, address and details    unknown    .
     (b) Been declined, postponed or limited for any life or other insurance or reinstatement thereof?     no
     If yes, explain

"9. Has proposed Insured made or does he contemplate making flights as a student pilot? No.

"Signed             Signed    Marvin Acree     
         Applicant                Agent.    "

Thereafter, on May 8, 1958, defendant's aforenamed Secretary wrote Acree a letter inclosing a list of policies, including the Boren policy, which it stated:

"* * * we are rejecting in accordance with our letter of April 14, 1958.

"We wish to advise you that the State Insurance Department has been informed that your license to represent Beacon Life Insurance Company has been cancelled."

Thereafter, in November, 1958, Boren's widow, Juno Malone Boren, as executrix of his estate, and the aforementioned Chickasha Bank, instituted this action, as plaintiffs, to recover from defendant the $5000.00 allegedly due under the subject insurance "policy", on account of Boren's death.

In its answer (supplemented by later pleadings unnecessary to mention), defendant alleged some of the undisputed facts hereinbefore stated, and, among other things, also alleged the following:

"11. Defendant states that W. M. Acree, at the time he executed the policy sued on herein, on April 29, 1958, he was acting as agent for plaintiff, First National Bank of Chickasha, the sole beneficiary under said policy as creditor of Dale Boren for the sum of $5,000.00 borrowed on that date from said Bank, and also as agent for defendant in the execution of said policy although defendant had notified him of the termination of said agency agreement, by its terms, it could not be terminated until the expiration of thirty days from the date of said notice. And by reason of the dual position of the said W. M. Acree in being an agent for said Bank and for defendant, whose positions were adverse, the said W. M. Acree could not bind defendant by the execution of said policy, without full knowledge and consent of defendant, and by reason of its execution by the said W. M. Acree without the knowledge of de-fendant, and without it having an opportunity to reject the same, said policy is void, under the rule of law that a man cannot serve two masters, and said policy is void and ineffective for the further reason that said application for insurance on the life of Dale Boren, was rejected by defendant under the terms of said agency agreement.

"12. Defendant states that by reason of the lack of authority of W. M. Acree to bind defendant, without its full knowledge and consent, and which consent was not given, as hereinabove set out, said policy never became in force and was not effective for any purpose, and defendant is not liable to plaintiffs."

In a cross petition attached to the above-quoted answer, defendant sought damages over against the plaintiff Bank in the amount of its costs in defending the action, increased by the amount of any money judgment the plaintiff, Juno Malone Boren, might obtain in the action against it, on the alleged theory that Acree was acting within the scope of his agency, as the Bank's President, when he made the Boren loan and executed the subject insurance policy, and that therefore said bank was responsible in damages for his said acts.

Thereafter, the plaintiff bank disclaimed any interest in the action on the ground that the aforementioned Boren loan had been repaid, leaving said bank without any claim, or interest, in plaintiffs' alleged cause of action; and, pursuant to its motion filed on the first day of the trial, said Bank was dismissed as a party to said alleged cause of action.

Before the trial had reached the point of instructing the jury, all three parties interposed separate motions, which, in effect, asked the court to enter judgment in the respective movants' favor and against each's respective adversary or opponents. The court ruled, in respect to said motions, that the case presented no issue of fact, discharged the jury, and, after other extended

procedure unnecessary to mention, took the case under advisement. After the court, in September, 1960, had written the attorneys for the parties a letter notifying them of the determinations he had arrived at in regard to the case, and requesting that a journal entry of judgment be prepared in accord therewith, such journal entry of judgment, incorporating said letter therein by reference, was entered, denying the plaintiff Juno Malone Boren any recovery against defendant, and denying defendant any recovery, on its cross petition, against the bank. After the overruling of her combination motion for judgment notwithstanding the previous judgment and alternative motion for a new trial, Juno Malone Boren (hereinafter referred to as if she had been the only plaintiff) perfected the present appeal.

Plaintiff urges several errors committed by the trial court, as ground for reversing the judgment, but, in our opinion the controlling question here is whether or not Boren and the defendant company, through Acree, ever entered into an enforceable contract of insurance. The instrument, plaintiff relies upon as evidencing such a contract, is shorter than the conventional life insurance policy, and is printed on the front and back of a single sheet, or page, in words and figures as follows:

"(FRONT)
"BEACON LIFE INSURANCE COMPANY
"Oklahoma City, Oklahoma
"(Hereinafter called Company)

"Account No.            Policy No. 38125

"AGREES TO PAY the amount of insurance determined according to the provisions hereof immediately upon receipt by Company at its Home Office of due proof that the death of the insured occurred within the terms of this policy.

"As used herein the word or words: insured, effective, date of policy, initial amount of interest, term in months, age, second beneficiary, and premium are as shown in the following schedule:

"SCHEDULE

"Insured (Print Name in Full (Age) Second Beneficiary (Print name in full)

   "Dale Boren          (57)

| "Effective Date of Policy | (Initial Amount) | (Term) | Premium) | This policy is |
|---|---|---|---|---|
| 4-29-58 | ($5,000.00 ) | ( 12) | 100.00)( ) | MONTHLY REDUCING TERM |
| Mo. Day Year | (of Insurance ) | (In ) (Months ) | ) | (X) LEVEL TERM |

"The amount of insurance payable hereunder in event of the death of the insured shall be paid, subject to the terms and conditions hereof, to Creditor as its interest may appear, and the remainder, if any, to the second

beneficiary or, if there be none, to the estate of the insured. This policy is issued in consideration of the application therefor and the payment in advance of the premium, receipt of which is hereby acknowledged. The provisions on the reverse side of this policy are a part hereof.

"IN WITNESS WHEREOF, Beacon Life Insurance Company has caused this policy to be executed as of the effective date of policy shown above. The insurance provided by this policy shall not take effect unless on the date hereof the named insured is alive and in sound health and less' than 66 years of age.

"K. R. Rone                          A. L. Gilham
        "Secretary                          President
"Creditor The First National Bank, Chickasha, Okla. Countersigned
                                        W. M. Acree Agent
.................................  ....................

"CLP–55  SINGLE PREMIUM, TERM LIFE INSURANCE-NON-
                                        PARTICIPATING

"(BACK)

"AMOUNT OF INSURANCE. If this policy is designated in the schedule as monthly reducing term, the amount of insurance in force during the first policy month beginning with the effective date of the policy shall be the initial amount shown in the schedule; at the end of the first and each subsequent policy month such initial amount of insurance shall decrease in the proportion that one month bears to the term in months of this insurance. If this policy is designated in the schedule as level term, the amount of insurance hereunder during the term in months reckoned from the effective date of the policy shall be the initial amount of insurance.

"GENERAL PROVISIONS. This policy constitutes the entire contract between the parties hereto and is incontestable. It shall expire on the expiration of the term in months reckoned from the effective date of policy. Any amount payable hereunder shall be paid at the Home Office of the Company upon surrender of this policy. If within one year from the date of this policy and while it is in force, the insured shall commit suicide, the Company's liability shall be limited to the amount of the premium paid, the reserve for this 'policy, or the amount payable to creditor as its interest herein may appear, whichever is greater. The reserve for this policy shall be computed on the Commissioner's 1941 Standard Ordinary Table of Mortality and three per cent interest." (Emphasis ours).

The basis of the trial court's judgment as reflected in his aforementioned letter of September 6, 1960, was as follows:

> "The Court is impressed with the fact that Mr. Acree was truly loyal to the bank, for whom he was acting as agent, but am unable to see where he was loyal to the other principal for whom he was acting as agent, the defendant in this case. He certainly did not reveal to defendant, at the time he submitted the insurance policy of Mr. Boren, that he was writing two policies, and that he was not staying within the limits of his authority in only writing policies on indebtedness being incurred at the time. He was also well aware that defendant had reserved the right to reject same. His knowledge in this respect necessarily became the knowledge of his other principal, the bank. Whether the difficulty of the bank's position caused them to dismiss at the trial of this matter is not before me, but I am unable to see how they could step out of the picture and place the plaintiff in any better position than the bank was since this policy was primarily written for the benefit of the bank and was only permitted to be written, under Mr. Acree's authority, for indebtedness incurred at the time of writing the policy. * * *." (Emphasis added).

—◇—

In our opinion, the fact that defendant's agent, Acree, wrote an insurance policy on the University Insurance Company in the same face amount, and about the same time, as he executed the subject instrument for defendant (it does not appear which was executed first) does not, on the basis of the record here, establish that he violated the provisions of his Agency Agreement (as defendant contends) that; "No insurance shall be written on a debtor except at the time the indebtedness is incurred." Furthermore, the record contains some evidence tending to show that the defendant's officers in Oklahoma City knew Acree was writing policies for other companies, at the same time he was representing it.

While, as hereinbefore mentioned, the defendant company, by its Secretary's letter of April 14, 1958, gave Acree notice that, since he had not surrendered his agency for said company, as earlier suggested to him by its President, it was going to exercise (or *start* exercising) its option to reject applications submitted by him, it is indicated that, for a long time before the "Walker" matter arose, defendant had probably accepted from Acree many instruments, identical in form to the present one, as binding insurance contracts, without an application therefor being filled out and mailed to it. And, it was also shown that after Acree met Gilham in Oklahoma City and promised to begin writing more ordinary life policies for the company, in proportion to the credit life business he obtained for it—and the previous controversy between Acree and the company had apparently been resolved at said meeting—the company had not only allowed him to retain, for use in its business, the supply of printed credit life forms like the one on which the subject instrument was executed, but Gilham then gave him more "supplies." In view of the latter circumstance, we think Acree may have been warranted in reasonably believing that defendant would then resume its previous practice. If he had not so believed, it is passingly strange that he would have vainly mailed a copy of the instrument, and attached deposit slip, without also including in said mailing a properly executed application.

In view of the evidence, the fact that the knowledge of Acree was legally imputable to the Bank loses much of the significance the trial judge apparently attached to it. We think the rule, which, under proper determinations of fact, might have been applied to this case, is as follows: Where an insurance company has furnished one of its agents with printed forms of an instrument possessing the essential characteristics of a valid credit life insurance policy, and said company, over a considerable period of time, has customarily accepted and recognized such instruments as enforceable contracts, or policies, of insurance, when filled out and, by said agent, countersigned and sold for a specified single premium remitted to it, without being accompanied by a written application therefor, and, under the evidence, the company knows, or should foresee, that the agent will continue, or resume, writing and selling said instruments thusly, unless it takes steps to prevent this, said company will not, when sued for enforcement of one of such writings, subsequently purchased in good faith, be heard to deny liability, on the ground that the agent did not have the actual authority to thus bind it. (In this connection, see the quotations from Hartford Life & Annuity Ins. Co. v. Unsell, 144 U.S. 439, 448, 12 S.Ct. 671, 36 L.Ed. 496, Insurance Co. v. Wolff, 95 U.S. 326, 24 L.Ed. 387, and other cases in Gish v. Insurance Co. of North America, 16 Okl. 59, 87 P. 869, 873–875, 13 L.R.A.,N.S., 826. See also 29 Am. Jur., "Insurance", section 153). Proper application of this rule results in the loss, brought about by an agent's exceeding his initial authority, being placed, as between the two adversaries, upon the party who has enabled him to accomplish it, in accord with principles of equity.

As there was evidence, from which the trier of facts might have correctly concluded that it was within Acree's *apparent* authority to make the subject writing immediately effective as a valid and binding insurance policy, and there was no evidence that such contract was ultra vires, or that the defendant could not, for any other reason, have vested him with sufficient authority to validly bind it on same, there was no burden on plaintiff (as contended by defendant under its "Proposition II") to establish that he had *actual* authority to do so. This case is fundamentally different from Shawnee Mut. Fire Ins. Co. v. Mc-Clure, 39 Okl. 535, 135 P. 1150, 49 L.R.A., N.S., 1054. It comes nearer being one for application of some of the principles discussed in Van Arsdale-Osborne Brokerage Co. v. Cooper, 28 Okl. 598, 115 P. 779.

Nor do we think, on the basis of the evidence, this court, or the trial court, could say as a matter of law, that it was Boren's duty (as defendant argues under its "Proposition I") to investigate, or inquire, into Acree's authority, as defendant's agent, before entering into such transaction with him. In this connection, see Palovik v. Absher, 198 Okl. 671, 181 P.2d 989 (2d syll.); 3 C.J.S. Agency § 317 pp. 258, 259, notes 40 and 41, and 2 Am.Jur., "Agency", § 99, note 19, and sec. 105, notes 20 and 1. Certainly, it cannot be said, as a matter of law, that Acree's statement concerning Boren's, or his company's, existing indebtedness to the bank, while importuning him to buy insurance, was sufficient to impose upon him that burden.

Nor did Boren's presumed knowledge of the fact, that in writing the policy, Acree was attempting to serve the bank as one master, as well as himself, in addition to the defendant, under the facts of this case, necessarily place such a duty on Boren. If Boren did not know, and had inquired, he might have learned that Acree had written the same type of insurance for depositors like himself (who were negotiating loans from the bank) on numerous occasions in the past, within the authority that defendant had, as a matter of practice, knowingly, and deliberately, vested in him. He might also have learned (if he had inquired) that many, or at least some, writings identical with the one Acree wanted to sell him, had gone into effect as recognized contracts of insurance without any written application

therefor. In view of the evidence of defendant's knowledge and approval of, or acquiescence in, Acree's procedure, it may ultimately be found to be in no better position than was the insurance company in Rockford Life Ins. Co. v. Tschiedel (Tex. Civ.App.) 61 S.W.2d 536, where the court held that the instructions said company's general agent had given the president and cashier of the bank there involved, rendered inapplicable the general rule invalidating a policy obtained by an agent, who has a direct interest in it, adverse to his principal, the insurer. It seems quite likely that such dual agency was the underlying reason that the Trial Judge, in the present case, ruled as he did. (In this connection, see 29 Am.Jur., "Insurance", sec. 140, and the Annotation at 48 A.L.R. 917, 931ff). But, assuming, as the Judge stated, that Acree's knowledge, as to the limitations on his actual authority, was imputable to the bank, as his "other principal", and that the subject instrument contemplated that the Bank was to be its first, or primary, beneficiary, such elements of the situation would lend defendant no aid or comfort, in view of the evidence, from which it might have been inferred that defendant not only knew Acree was selling its policies, without applications, but that it was actively cooperating with, and assisting, him in this practice. In view of its said conduct, it is questionable if defendant can complain that Acree's said mode of operation was "undisclosed" to it as his principal, and that it can rely upon Acree's knowledge being imputed to the bank (as his other master or principal) because of this showing that *it also had such knowledge*. This feature of the case comprises one controlling distinction between it and Independence Indemnity Co. v. Silver State Bldg. & Loan Ass'n., 93 Colo. 240, 25 P.2d 726.

As herein indicated there was evidence in the present case creating issues of fact, determinative of defendant's liability, or lack of it, which have never been properly adjudicated. It is therefore our opinion that the trial court erred in discharging the jury and rendering that part of the judgment herein complained of. He should therefore have sustained plaintiff's motion for a new trial. Accordingly, his order and/or judgment overruling it is reversed, and this cause is remanded to said court with directions to grant the new trial.

WILLIAMS, C. J., and WELCH, DAVISON, HALLEY, JOHNSON, IRWIN and BERRY, JJ., concur.